# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

OSCAR RAMIREZ,

    *Plaintiff,*

v.

W.B. HAUGHTON, III, d/b/a/ ECO STRIP,

    *Defendant.*

Case No. 12-4020-EFM

## MEMORANDUM AND ORDER

Plaintiff Oscar Ramirez sued his former supervisor, Defendant W.B. "Bruce" Haughton III, for disparate treatment on the basis of national origin in violation of Title VII of the Civil Rights Act of 1964,[1] 42 U.S.C. § 1981, and the Kansas Act Against Discrimination.[2] Haughton now moves for summary judgment on the grounds that Ramirez has failed to make a prima facie showing of disparate treatment. Because the basis for Ramirez's claims are based solely on conclusory allegations, the Court grants Haughton's motion for summary judgment.

---

[1] 42 U.S.C. §§ 2000e *et seq.*

[2] Kan. Stat. Ann. §§ 44-1001 *et seq.*

## I. Factual Background[3]

Plaintiff Oscar Ramirez began working for Defendant W.B. "Bruce" Haughton III on February 4, 2010. Haughton appears to be the owner of Precision Pipe Cover, Inc. ("PPC"), which has an operating division called ECO Strip.[4] PPC is located in Topeka, Kansas, and does contract work as a scrap recycler for the Goodyear Tire and Rubber Company. Ramirez was initially hired as a temporary employee through a staffing agency, and was later hired as a full-time employee to perform contract work at Goodyear's Topeka plant.

On July 21, 2010, Haughton held an employee meeting regarding new procedures for PPC employees regarding their entry and parking at the Goodyear plant. A PPC secretary in attendance took notes of the meeting and later transcribed them. Ramirez attended the July 21 meeting and translated Haughton's comments for two of Ramirez's Spanish-speaking co-workers. Haughton read aloud a written notification that had been stapled to each employee's paycheck that day. The notice informed employees that they would now be required to use a badge to enter the Goodyear facility in the morning.

Haughton also explained rules regarding parking at the Goodyear facility. The plant has two adjacent lanes that enter a parking lot on the north side of the facility. One gate is for Goodyear employees and is blocked by a lift arm that opens via transponder technology. The

---

[3] In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, related in the light most favorable to the nonmovant, Ramirez. Because Ramirez labeled most of Haughton's factual assertions as contested, but failed to provide an on-point reason for the dispute, the Court will relate all facts that were not properly contested in addition to those facts that Ramirez labeled as uncontested.

[4] The record is unclear as to Haughton's relationship with PPC and ECO Strip. Haughton's summary judgment memorandum simply states that "ECO Strip is *not* a sole-proprietorship owned and operated by W.B. Haughton, III." Def.'s Mem., Doc. 35, at ¶ 2 (emphasis added). Haughton is, however, listed with the Kansas Secretary of State as the resident agent for PPC. *See* Pl.'s Response Mem., Doc. 38-8, at 2. Because the Court is ruling on the merits of Haughton's motion rather than his claims that he is not the proper party to be sued, the Court will not linger over this gap in the record.

second gate is for contractor's employees; it does not have transponder technology, but instead requires employees to check in with a security guard who is posted at the gate. It was a long-standing policy of both PPC and Goodyear that PPC employees were not allowed to drive their private vehicles onto Goodyear property. At the July 21 meeting, Haughton told the PPC employees that they were not allowed to drive their personal vehicles through the Goodyear gate, but should instead park in a lot to the west of the facility, walk to the security guard on the north side, and then present their badges to enter the Goodyear property. According to the transcribed minutes of the meeting, the following exchange then occurred between a PPC employee and Haughton:

> [Employee] asked—"Can I cut thru [sic] the Goodyear gate to get to the contractor parking?"
>
> Bruce's response—"No you must go to Indianola Road and around to get to the contract parking. If anyone drives through the Goodyear gate, everyone will have to park in the new contractor parking area and walk around to get to the guard shack. One person can mess this up for everyone if they do not follow these directions and everyone will have a farther distance to walk."[5]

Ramirez was informed of parking procedures at some point during his employment, and he testified at his deposition that he knew he was not supposed to enter the Goodyear gate.[6] Ramirez does not, however, remember Haughton making the aforementioned comments at the July 21 meeting, nor was he told that termination would result from a parking violation.

On July 28, 2010—one week after Haughton explained the parking procedures to PPC employees—Ramirez drove his personal vehicle through the Goodyear gate and onto Goodyear property. Goodyear's Human Resources Manager, Charles Hollis, was in the area of the two

---

[5] Haughton Aff. (Ex. A)—Attachment H, Doc. 35-8, at 14–15.

[6] *See* Ramirez Dep. (Ex. B), Doc. 35-9, at 12.

entrance gates at the time Ramirez entered the property. According to his affidavit,[7] Hollis saw Ramirez drive his vehicle up the lane that led to the contractor gate. Another vehicle was in line ahead of Ramirez, waiting to clear security. Hollis then saw Ramirez pull his vehicle out of the lane for the contractor gate into the lane leading to the Goodyear employees' gate. Ramirez entered the Goodyear employee's entrance, trying to avoid the lift gate by driving around the arm, but the vehicle struck the gate's arm. Believing that he did not cause any damage to the gate, Ramirez continued driving onto the Goodyear property.

After Ramirez parked, Hollis confronted him. Using offensive language, Hollis asked Ramirez for his name and employer, which Ramirez relayed. Hollis then told Haughton that, due to the incident with the gate, Ramirez "was not to be assigned to work on the Goodyear Plant property in the future."[8] PPC had hired Ramirez as a permanent employee to perform work at Goodyear's Topeka plant. After the conclusion of the workday, Haughton called Ramirez and terminated his employment with PPC. Ramirez offered to pay for any damage that he caused to the gate and offered to work in Haughton's "shop" which was allegedly a facility separate from the Goodyear facility. Ramirez also told Haughton that other people improperly used the Goodyear employee gate. These pleas went unanswered.

Ramirez was born in Mexico and was brought to the United States as a child. He has remained in the country as an undocumented alien and is therefore unauthorized to work in the United States. At the time Haughton hired Ramirez for full-time employment, Haughton was aware that Ramirez was an undocumented worker. Ramirez claims that Haughton and other PPC employees made jokes about Hispanics that made Ramirez uncomfortable.

---

[7] Hollis Aff. (Ex. C), Doc. 35-4.

[8] *Id.* at ¶ 8.

Ramirez recalls an incident involving a non-Hispanic PPC employee, Ryan Smith. Haughton personally witnessed an incident in which Smith damaged a PPC vehicle on Goodyear property. Smith was operating the PPC truck at an intersection on Goodyear property when the trailer sitting in front of Smith's truck came loose and rolled onto Smith's truck. Ramirez claims Smith was told not to park his truck behind the trailer. The accident involving Smith did not damage any Goodyear property or violate Goodyear policy. The accident did not involve the parking policy or the prohibition against PPC employees driving their personal vehicles onto Goodyear property. Smith was authorized to be in the area where the accident occurred.

After his termination, Ramirez filed a claim with the Kansas Human Rights Commission ("KHRC"), alleging that ECO Strip violated the Kansas Act Against Discrimination ("KAAD")[9] by discriminating against Ramirez on the basis of his national origin. The KHRC responded with a letter informing Ramirez that its investigation yielded a determination of "No Probable Cause." Ramirez appealed the decision to the Equal Employment Opportunity Commission, which adopted the findings of the KHRC and dismissed the claim. Ramirez then filed suit in state court against Haughton and Goodyear, alleging disparate treatment on the basis of national origin in violation of Title VII, 42 U.S.C. § 1981, and the KAAD. Goodyear removed the suit to federal court, and was later dismissed from the suit pursuant to a stipulation between the parties.[10] Haughton now moves for summary judgment.

---

[9] Kan. Stat. Ann. § 44-1009(a)(1).

[10] *See* Order Dismissing Party, Doc. 31; Stipulation of Dismissal, Doc. 27.

## II. Legal Standards

**A. Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[11] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[12] The movant bears the initial burden of proof, and must show the lack of evidence on an essential element of the claim.[13] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[14] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[15] The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment,[16] and the Court will not grant summary judgment "where there is reason to believe that the better course would be to proceed to a full trial.[17]

---

[11] Fed. R. Civ. P. 56(c).

[12] *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[13] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[14] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[15] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[16] *LifeWise Master Funding*, 374 F.3d at 927.

[17] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

B.   **Title VII of the Civil Rights Act of 1964**

Title VII of the Civil Rights Act prohibits an employer from treating a particular person less favorably than others on the basis of national origin.[18] To prove disparate treatment, a plaintiff must show that the defendant acted with a discriminatory intent or motive.[19] The parties' burdens of proof are subject to the tripartite *McDonnell Douglas* framework.[20] First, the plaintiff carries the initial burden of establishing a prima facie case of racial discrimination.[21] To make a prima facie case of disparate treatment based on the plaintiff's discharge for violating a work rule, the plaintiff must show that "(1) he is a member of a protected class; (2) he was discharged for violating a work rule; and (3) similarly situated non-minority employees were treated differently."[22] Although the comparison between employees' treatment need not be based on violation of the same work rule, the employees' violations must be of "comparable seriousness."[23]

If the plaintiff meets the initial burden of proof, the burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions.[24] If the defendant presents such a reason, the burden returns to the plaintiff who must show that the defendant's stated reason is a

---

[18]   42 U.S.C. § 2000e-2(a).

[19]   *See Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 986 (1988).

[20]   *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1972).

[21]   *Adamson v. Multi Community Diversified Servs., Inc.*, 541 F.3d 1136, 1145 (10th Cir. 2008).

[22]   *Elmore v. Capstan, Inc.*, 58 F.3d 525, 529–30 (10th Cir. 1995) (citing *EEOC v. Flasher*, 986 F.2d 1312, 1316 (10th Cir. 1992)).

[23]   *Id.* at 530 (quoting *Flasher*, 986 F.2d at 1316).

[24]   *McDonnell Douglas*, 411 U.S. at 802–03.

pretext for discriminatory intent.[25] In a disparate treatment case, a plaintiff may show pretext by reference to other similarly-situated non-minority employees who received disparate discipline.[26] "The ultimate factual determination of whether the employer's decision was motivated by intentional discrimination based upon protected class characteristics is for the trier of fact."[27]

**C.  42 U.S.C. § 1981**

Section 1981 ensures to all persons the same right to make and enforce contracts "as is enjoyed by white citizens."[28] Employment contracts are among those protected under § 1981.[29] The standards for proving a violation of § 1981 are identical to those for proving a violation of Title VII.[30]

**D.  Kansas Act Against Discrimination**

Like Title VII, the KAAD prohibits employment practices that discriminate against individuals on the basis of national origin or ancestry.[31] Due to their analogous relationship,[32] claims of disparate treatment brought under the KAAD are subject to the same *McDonnell Douglas* burden-shifting analysis as claims brought under Title VII.[33]

---

[25]  *See Elmore*, 58 F.3d at 530.

[26]  *Id.*

[27]  *Id.*

[28]  42 U.S.C. § 1981.

[29]  *See Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 (8th Cir. 1975); *Backlund v. Hessen*, 904 F. Supp. 964, 967 (D. Minn. 1995), *rev. on other grounds* 104 F.3d 1031 (8th Cir. 1997).

[30]  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011).

[31]  Kan. Stat. Ann. § 44-1009(a).

[32]  *Munoz v. Western Resources, Inc.*, 225 F. Supp. 2d 1265, 1269 (D. Kan. 2002).

[33]  *See Land v. Midwest Office Tech., Inc.*, 114 F. Supp. 1121, 1139 (D. Kan. 2000).

### III. Analysis

Haughton makes four arguments in support of his motion for summary judgment: (1) lack of genuine issue of disparate treatment, (2) Ramirez was not qualified at the time he was terminated, (3) Ramirez is not authorized to work in the United States, and (4) Haughton was not Ramirez's employer. Because the Court finds that Ramirez has failed to establish a prima facie case of disparate treatment, the Court will address only Haughton's first argument for summary judgment.

Ramirez's lawsuit is based on a claim of disparate treatment on the basis of national origin. Although Ramirez brings his claim under three different provisions—Title VII, § 1981, and the KAAD—each requires the same showing from the parties on summary judgment. Specifically, Ramirez carries an initial burden of proving: (1) that he is a member of a protected class; (2) that he was discharged for violating a work rule; and (3) that similarly situated non-minority employees were treated differently for substantially similar infractions.[34] The first two factors are not in dispute. Instead, the parties contest whether a reasonable jury would conclude that Ramirez and Smith were similarly-situated employees whom Haughton treated in a disparate manner.

When determining whether employees are similarly situated for comparison in a disparate treatment claim, the Court must "compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees."[35] Ramirez bears the burden of producing admissible evidence that

---

[34] *Elmore v. Capstan, Inc.*, 58 F.3d 525, 529–30 (10th Cir. 1995) (citing *EEOC v. Flasher*, 986 F.2d 1312, 1316 (10th Cir. 1992)).

[35] *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) (citations omitted).

identifies "similarly situated workers who were treated differently, their national origins, and the circumstances surrounding their more favorable treatment."[36]

Ramirez does not contest that he pulled out of the line to enter the contractor's gate, attempted to drive around the gate blocking the Goodyear employee entrance, and drove his personal vehicle onto Goodyear property. Although he claims that he was unaware of the policy, he does not contest that his actions violated PPC and Goodyear policy. Furthermore, Ramirez does not contest assertions from Haughton or Hollis that Ramirez was subsequently banned from entering Goodyear property.

Ramirez has not presented any evidence other than his own sworn statements about the incident involving Ryan Smith. The parties agree, however, that Smith was driving a PPC vehicle at the time of his accident, that he had permission to be on Goodyear's property, and that no Goodyear official banned Smith from working at Goodyear's facility. Ramirez contends that Smith violated a direct order from Haughton when Smith parked the company truck behind the trailer. But Ramirez did not present any evidence to support his allegation, and Haughton denies the same and further states that Smith did not violate any company policies.

Other decisions from this district comparing employees alleging disparate treatment on the basis of national origin are instructive in the comparison now before this Court. In *Munoz v. Western Resources, Inc.*, the plaintiff argued that his thirty-day suspension for violating a sick-leave policy was overly harsh when compared to less punitive discipline meted out to co-workers who were caught drinking and shooting guns in the company parking lot.[37] The court rejected the contention that the employees were similarly situated, and instead compared the plaintiff and

---

[36] *Escalante v. IBP, Inc.*, 199 F. Supp. 2d 1093, 1098–99 (D. Kan. 2002) (citation omitted).

[37] 225 F. Supp. 2d at 1271–72.

his suspension to a Caucasian co-worker who was also suspended for violating the company's sick-leave policies.[38] Similarly, the infractions Ramirez asks the Court to compare are too distinct for correlation. Ramirez was driving his own personal vehicle, entered the Goodyear facility without permission, damaged Goodyear's property solely by his own malfeasance, and was subsequently banned from the facility. Smith, in contrast, was driving a PPC truck, had permission to be on Goodyear's property, damaged PPC property, did not cause the accident through any affirmative act on his part, and was not banned from the Goodyear facility by a Goodyear official. Indeed, the only similarity between the two incidents is the involvement of motor vehicles.

In *Escalante v. IBP, Inc.*, the plaintiff argued that his termination for failure to wear a safety apron should be compared with an incident where two co-workers who were found to be in possession of each other's safety equipment were simply instructed to switch the equipment back.[39] The court found that these circumstances were not substantially similar because, unlike the failure to wear the safety apron, the act of wearing another person's safety equipment was not listed in the employer's policies as a safety violation.[40] Similarly, Ramirez presents no evidence that Smith violated company policy. Ramirez, however, violated Goodyear's security protocol and his employer's express parking policy, which he had sufficient notice of via the letter stapled to his paycheck and the employee meeting on July 21.

Due to the distinct circumstances of the incidences involving Ramirez and Smith, the Court finds that the two employees were not similarly situated. Ramirez, therefore, has failed to

---

[38] *Id.* at 1272.

[39] 199 F. Supp. 2d at 1099.

[40] *Id.*

present a prima facie case of disparate treatment.  Because Ramirez cannot satisfy his initial burden, the Court need not continue the McDonnell Douglas analysis of the parties' evidence and arguments.  The Court concludes that no reasonable jury could find that Haughton treated Ramirez in a manner disparate from similarly-situated, non-minority employees.  Consequently, summary judgment must be entered in Haughton's favor.

**IT IS ACCORDINGLY ORDERED** this 15th day of March, 2013, that Defendant W.B. Haughton, III's Motion for Summary Judgment (Doc. 34) is hereby **GRANTED**.

**IT IS SO ORDERED**.

*[signature]*
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE